Cecilia **LACKS**, Plaintiff-Respondent,

v.

**R. ROWLAND & CO., INC.,**
Defendant-Appellant.

No. 50148.

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 4, 1986.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Sept. 24, 1986.

Application to Transfer Denied
Nov. 18, 1986.

Martin P. Zucker, St. Louis, for defendant-appellant.

David M. Harris, St. Louis, for plaintiff-respondent.

REINHARD, Judge.

Defendant appeals from a judgment for plaintiff, entered in accordance with a jury verdict, awarding plaintiff $874.00 actual and $7,500 punitive damages on her conversion claim. We affirm.

The present dispute arose from a stock transaction involving plaintiff and defendant, a company which provides brokerage services. On May 7, 1981, plaintiff telephoned Tom Walter, a stock broker employed by defendant, and placed an open order to sell her 200 shares of Reece Corporation stock if the price of that stock reached 11¾ per share. On May 20, 1981, defendant was notified by its representative on the floor of the New York Stock Exchange that plaintiff's stock had been sold at the requested price. Defendant sent plaintiff confirmation of the sale and informed her that she should send the stock certificates to defendant by May 28, 1981, the settlement date. Plaintiff promptly mailed defendant her two certificates, each representing 100 shares, and defendant sent plaintiff a check for $2,285.51 on May 27, which constituted the proceeds from the sale less defendant's commission and taxes. Plaintiff received the check on May 28, and deposited it in her checking account by mailing it to her bank. On Thursday, May 28, defendant was notified by the New York Stock Exchange that there had been a mistake and that the price had never reached 11¾. Jerry Dolan, defendant's compliance officer and a vice president at the time of the transaction, testified that under New York Stock Exchange rules no trade occurred and the mistakenly reported "fill" could not be honored.

When Mr. Walter was informed of the error he attempted several times to contact plaintiff, without success. Prior to leaving on a business trip the next morning, Mr. Walter instructed his secretary to inform plaintiff that there had been a mistake at the stock exchange and no trade occurred. Plaintiff testified that she received a phone call from the secretary on May 29, and was told that there "was something wrong" with the transaction and that "it was going to be cancelled." When plaintiff asked to speak to Mr. Walter, the secretary explained that he was out of town, but would be back on Monday, June 1. Plaintiff left a message for him to call her. Plaintiff received written notice of the cancellation on June 2. On that same day she contacted Walter, who told her that the stock never reached 11¾ and that there had been a mistake. Walter gave plaintiff Mr. Dolan's phone number, and she called him as well. Mr. Dolan testified that he told her "there was a report of a fill from the New York Exchange, an inaccurate report, which was later classified as an error in transmission. Somebody, some person, wrote out a fill on a piece of paper and transmitted a fill to us in St. Louis." He further informed her that defendant was "prohibited by law [from honoring] that trade if the trade in fact did not occur ..." Both Dolan and Walter told plaintiff they could sell the stock for her if she so desired, but she replied that she "never wanted to deal with R. Rowland again; I was through with them."

On June 3, after discussing the matter with her sister and her brother-in-law, an attorney practicing in Chicago, she called Walter again and told him:

... that after the conversations yesterday that I wanted—that what I wanted to do was forget the whole thing. First I stated, that I wanted my stocks back and I will pay you back the money. Where are my stocks? And, he said you know where your stocks are, and I said, I don't know where the stocks are; I want you

to tell me where the stocks are, and he said your stocks are downstairs in the office in the files at Rowland, and I said wonderful, we can end this if you'll mail them back to me and I should get them within three days and I will mail back the check. I told them, I don't want to talk to you again or deal with you again; it will be all over with.

She then called Dolan and told him "the same thing."

When she had not received her certificates by June 9 she sent a letter of complaint to the New York Stock Exchange. On June 18 she received notice from her bank that payment on the check she received from defendant had been denied on June 12. She called defendant's president on June 18 and received a phone call from Walter later that day. She testified that:

He told me that they were having some problems with it. He was having some problems with the stock certificates, that in fact, he didn't have my stock certificates, as he stated, in the office, and now he was going to have to get them from New York.... he said, that's why I hadn't gotten them back; they were having a problem getting new ones out of New York; it was taking longer than what he thought it would.

Dolan testified that defendant had attempted to comply with plaintiff's request that it return the two original certificates, which the transferring agent "refused to deliver," and that a replacement certificate had to be issued.

Later that week plaintiff was informed by Walter's secretary that the stock certificate had arrived, but that it would not be sent to her until she returned the check. Plaintiff then called Walter, who confirmed what his secretary had said. Plaintiff returned the check by registered mail and defendant received it on July 10. However, this apparently did not come to the attention of Walter or Dolan, both of whom testified that they were unaware that the check had been returned until much later. Dolan explained that SEC regulations require a central review point for mail coming into and out of brokerage offices; therefore, all incoming mail was opened by "an authorized person" in the mail room, and checks were routed directly to the cash department. Plaintiff enclosed only the check, without a letter of explanation, and it was apparently sent to the cashier.

When plaintiff did not receive her certificate she wrote a letter of complaint to the SEC on July 28, in which she explained that despite returning the check on July 9 she still did not have her certificate. The SEC wrote a letter to defendant, asking it to look into the matter and send a letter of explanation to plaintiff. Enclosed was a copy of the letter plaintiff had written to the SEC. Mr. Dolan responded on August 21 with a letter to plaintiff setting out the chronology of events and stating that "[w]e have asked you to exchange the check in return for 200 RCE."

Plaintiff then asked her brother-in-law, Mr. Wexler, to write a letter to defendant on her behalf. Defendant responded in a letter to Mr. Wexler dated January 6, 1982, that:

\* \* \* \* \* \*

It is our position that we must deny any liability for the following reasons:

1) The confirmation sent to Ms. Lacks was in error. A sale did not occur at $11\frac{3}{4}$ and, in fact, the high for the year at the time was $10\frac{5}{8}$.

2) All "D" series checks have automatic holds placed on their payment. R. Rowland rightly denied payment of check # D123924 payable to Ms. Lacks because no money was owed.

3) Ms. Lacks was, at all times, given full explanations of the situation and was always treated with complete courtesy and understanding.

4) Ms. Lacks has her stock in hand by this date. (Sent 12/31/81) Any delay caused could have been prevented by her prompt return of our check to her.

However, it was not until March 16, 1982, that plaintiff received a certificate representing 200 shares of Reece Corporation

stock, which was made out in plaintiff's name and dated June 11, 1981.

Plaintiff presented evidence of the stock's value during the period of the alleged conversion. Plaintiff's exhibit # 21, which contained the closing value of Reece Corporation stock for each trading date from May 1, 1981, through January 31, 1984, was admitted into evidence without objection, and defendant stipulated to its accuracy.

Plaintiff testified that "[she] wanted the certificates back to do what [she] wanted with them," although she never attempted to sell the stock during the period of the alleged conversion. Walter testified that plaintiff could have sold the stock through another broker at any time, and explained the process: "... the actual transfer would be by telephone and a [transfer] paper, and the certificate would follow later." Walter further testified that most investors he dealt with "leave their securities in their accounts" at Rowland; "[v]ery few of them ever have them issued to themselves." It should also be pointed out that throughout this controversy defendant continued to send plaintiff monthly statements indicating that she had 200 shares of Reece stock in her account.

Defendant's principal point on appeal is that the trial court erred in denying its motion for directed verdict "for the reasons that (A) under RSMo 400.8–313(1)(c), no conversion of the 200 shares of Reece stock occurred because the plaintiff as a matter of law at all times owned, possessed, controlled, and had delivery of the ... stock, and (B) although the evidence showed that [defendant] held plaintiff's stock certificates, there was no evidence that [defendant] held the stock certificates with the intent to convert them to its own use and thus, as a matter of law, there was no conversion."

A directed verdict is a drastic action and should be granted only if reasonable and honest men could not differ on the disposition of a case. In passing upon a motion for a directed verdict, the reviewing court must give plaintiff the most favorable view

of all the evidence and the benefit of all favorable inferences to be drawn therefrom. *Peete v. Equitable Life Assurance Soc. of U.S.*, 697 S.W.2d 232, 235 (Mo.App. 1985). With this in mind we examine defendant's contentions.

■ Conversion may be proved in one of three ways: by tortious taking; by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to rights of owner; or by refusal to give up possession to owner on demand. *Arnold v. Prange*, 541 S.W.2d 27, 30 (Mo.App.1976). The law of conversion is concerned with possession, not title. *McCullough v. Beatty Oil Co.*, 444 S.W.2d 53, 59 (Mo.App.1969). Generally, the question of good faith and the elements of motive, knowledge or ignorance, or care or negligence are not involved in conversion actions. *Coffmann v. Faulkner*, 591 S.W.2d 23 (Mo.App.1979). Furthermore, intent to convert may be inferred from the facts and circumstances. *Schulte v. Florian*, 370 S.W.2d 623, 625 (Mo.App.1963).

Historically wrongful appropriation of stock certificates constitutes conversion of the stock. As has been noted:

It is, of course, true, as a legal concept, that a stock certificate is but an evidence of title to the property right which its owner has in the corporate stock. Important practical results may flow from a distinction between the two things. Nevertheless, "certificates of stock are treated by business men as property for all practical purposes." And the courts long since came to treat a willful and wrongful taking and disposal of stock certificates as a conversion of the property itself. (citations omitted).

*Pierpoint v. Hoyt*, 260 N.Y. 26, 182 N.E. 235, 83 A.L.R. 1195, 19977 (1932) [cited in *Prugh, Combest & Land v. Linwood State Bank*, 241 S.W.2d 83, 90–91 (Mo.App. 1951)].

Missouri case law follows the general rule. In *Harbaugh v. Ford Roofing Products Co.*, 281 S.W. 686, 690 (Mo.1926), the Missouri Supreme Court considered a suit

for conversion of stock in which the defendant refused to deliver certificates of stock to plaintiff, but had, however, transferred the stock to plaintiff's name in the corporate records. The defendant claimed that the conversion, if any, was merely technical. Judge Atwood, addressing issues raised in a motion for rehearing, stated:

> Appellant also insists that we have overlooked its contention that the conversion, if any, was merely technical, and, since the stock was transferred on the company's books, the certificate tendered in court and is now available, plaintiff would at most be entitled to recover no more than nominal damages and costs. This contention hardly merits serious consideration. If plaintiff was entitled to anything, he was entitled to possession of the stock, as well as to a transfer of the same on the books of the company. He was wrongfully and unreasonably deprived of this right. Defendant cannot now escape the consequences of its act by the claim that its refusal to deliver the stock was a mere technical wrong. There was an actual conversion of the stock, and on the record before us the verdict was not excessive.

We believe that under the Missouri common law plaintiff clearly made a case of conversion of the stock; and defendant does not appear to contend otherwise.[1] However, in 1963 Missouri adopted the Uniform Commercial Code. *See*, Chapter 400, RSMo 1978. Defendant contends that under § 400.8–313(1)(c), RSMo 1978, plaintiff at all times had possession of the certificate.

Section 400.8–313(1)(c) provides:

> (1) Delivery to a purchaser[2] occurs when
> (c) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser; ...

Subsection (2) makes it clear that a purchaser taking delivery under § 400.8–313(1)(c) is a "holder," a term which is defined as "a person who is *in possession* of a document of title or an instrument or an investment security drawn, issued or endorsed to him ..." (emphasis ours). § 400.1–201(20), RSMo 1978. Thus, defendant reasons that if § 400.8–313(1)(c) applies, as it contends it does, the shares of stock were in the possession of plaintiff and could have been sold by her at any time. Plaintiff would have had no more authority over or control of the shares had she physically possessed the certificates. *See, Weiss v. Dempsey-Tegeler & Co.*, 443 S.W.2d 934, 935 (Tex.Civ.App.1969); *Tangorra v. Hagan Investing Corp.*, 327 N.Y. S.2d 131, 38 A.2d 671 (N.Y.App.Div.1979).

Plaintiff retorts that this section does not apply in this case because the broker/client relationship had been terminated. We find no cases interpretating this section of the Uniform Commercial Code where a party has contended that the relationship was terminated.

■ However, § 400.8–313(1)(c) applies only in the context of a broker/client relationship. § 400.8–313, U.C.C. Comment 1, V.A.M.S. 1979. "A broker/client relationship and its creation is normally no different than an agent/principal relationship and its creation." *Mueller v. Ruddy*, 617 S.W.2d 466 (Mo.App.1981). The critical question, in regard to the existence of the relationship, is whether the parties' conduct, considered objectively, manifests reciprocal consent to the relationship. *Id.* Section 118 of the Restatement of Agency states: "Authority terminates if the principal or the agent manifests to the other dissent to its continuance." Section 119 provides:

> Authority created in any manner terminates when either party in any manner

---

**1.** At page 6 of its reply brief defendant states: Rowland does not dispute that if a person takes wrongful possession of a stock certificate without complying with R.S.Mo. § 400.8–313(1)(b), (c), (d), or (e) that he may be liable for conversion of the shares underlying the stock certificate.

**2.** We note that the definition of "purchase" "includes taking by ... issue or re-issue." § 400.1–201(32), RSMo. 1978.

manifests to the other dissent to its continuance or, unless otherwise agreed, when the other has notice of dissent.

▓ Plaintiff argues that she terminated the broker/client relationship which existed between her and defendant in the June 3 conversations with Walter and Dolan, in which she stated she "was through with [defendant]" and "didn't want to deal with them anymore." Dolan testified that he received such notice. However, she also made it clear that she wanted her original certificates returned, and when informed that that was not possible, assented to defendant securing a replacement. Her conduct, while terminating the agency relationship in all other respects, did not revoke defendant's authority to act as her broker in obtaining the re-issued certificate. Defendant therefore continued to act as plaintiff's broker for that limited purpose.[3]

▓ However, this does not end our inquiry. The fact that defendant took delivery of the certificate for plaintiff, temporarily placing plaintiff in possession of her stock, does not authorize defendant to hold that certificate in perpetuity, in total disregard of plaintiff's repeated demands that it be returned to her. As we previously noted, § 400.8–313 does not apply outside a broker/client context. Here, that relationship terminated when defendant obtained and received the re-issued certificate, which was the last act it was authorized to undertake as plaintiff's broker. Once defendant ceased to be her broker it was in the same position as any other person who wrongfully withholds a stock certificate. We cannot believe it was the intention of the drafters of § 400.8–313(1)(c) that a broker be allowed to withhold with impunity stock certificates which a customer is legally entitled to physically possess, as occurred here.

▓ Defendant's argument that they were ready and willing to *sell* the stock for plaintiff at any time, and that plaintiff therefore was not in anyway deprived of dominion over its stock is also unsound. The owner of stock may have other incidents of ownership that he or she may wish to exercise. Furthermore, that plaintiff retained *title*, as opposed to possession, and could theoretically exercise certain attributes of ownership does not prevent her from recovering for conversion, since conversion is concerned with possession, not title. According to plaintiff's testimony, she was informed by defendant shortly after June 18, 1981, that the certificate had arrived in defendant's office, but that it would not be sent to her until she returned the check. We believe a submissible case was made that defendant converted the stock at that point.

▓ Defendant also contends that the court erred in instructing the jury on punitive damages, alleging that "there was no evidence adduced at trial from which the jury could find that defendant maliciously converted the ... stock ... because the evidence showed that [defendant] held plaintiff's stock certificates under a good faith mistaken belief that plaintiff had failed to return the check which was a precondition to delivering the stock certificates." This point is without merit. Plaintiff's evidence indicated that the initial agreement between the parties was that she would return the check *after* she received her certificate, and defendant had a fiduciary duty to comply with her request. It is hard to understand defendant's vehemence in its attempt to unilaterally impose a precondition on its compliance, in that the

---

**3.** Plaintiff raises an issue as to whether defendant complied with § 400.8–313, arguing that defendant did not have the specific security in its possession. However, the evidence clearly shows that the certificate representing negotiable evidence of the stock ownership was in the hands of the Depository Trust Company for the account of R. Rowland. Thus, prior to its arrival at defendant's office, the stock certificate was being held by defendant's clearing agent.

As was noted in *Matthysse v. Securities Processing Service, Inc.,* 444 F.Supp. 1009, 1018 (S.D.N.Y.1977), U.C.C. § 8–313(1)(c) does not require the broker to maintain actual physical possession of the certificate inside its own offices; "effective" possession may be found where a clearing agent holds the securities for the broker. Thus, defendant complied with § 400.8–313 in obtaining the re-issued certificate.

check it sought not only was subject to an automatic hold order, but had been prominently stamped "denied" and "stop payment."

Defendant's "good faith" argument becomes still weaker upon consideration of the correspondence involving it, the SEC, and plaintiff. Plaintiff's July 28 letter to the SEC, in which she explained that she had returned the cancelled check on July 9, was sent to defendant by the SEC. Defendant also stated in a January 6 letter to Mr. Wexler that plaintiff's stock certificate had been returned to her on December 31, 1981, although it was not sent until March 16, 1982. The picture that emerges is that defendant held plaintiff's stock for approximately nine months, despite the fact that plaintiff returned the check as requested and despite her numerous attempts to obtain her stock certificate, which included complaints to the N.Y. Stock Exchange and the SEC, as well as a letter from her attorney. The circumstances were such that malice could reasonably be inferred and fully supported the punitive damage instruction.

■ On appeal defendant challenges neither plaintiff's damage instruction nor the amount of actual damages. It does contend, however, that the trial court erred in excluding from evidence defendant's Exhibit D, a confirmation from Morgan Stanley & Company which reflects that plaintiff sold her 200 shares of stock at $9.25 per share on January 19, 1984. We disagree. The measure of damages in an action for conversion of personal property is generally based upon the reasonable market value of the property *at the time of conversion.* Breece v. Jett, 556 S.W.2d 696, 709 (Mo. App.1977). Where the property is returned to the owner after the conversion the measure of damages is the difference between the value of the property at the time of the conversion and the value at the time of the return, plus the reasonable value for the loss of use of the property. *See,* Vetter v. Browne, 231 Mo.App. 1147, 85 S.W.2d 197, 199 (1935). Here, the stock was converted on or about June 19, 1981, and was re-

turned on March 16, 1982. The evidence of market value that defendant offered was not within a reasonable time of either the date of conversion or the date of return. We find no error in the court's refusal to admit this evidence.

■ Finally, defendant raises two issues in regard to plaintiff's verdict directing instruction. That instruction was as follows:

Your verdict must be for plaintiff if you believe:

First, plaintiff owned 200 shares of Reece Company stock, and

Second, the 200 shares of Reece Company stock came into the possession and control of defendant, and

Third, plaintiff made a demand upon defendant to return the 200 shares of Reece Company stock, and

Fourth, defendant then intentionally refused to return the 200 shares of Reece Company stock to plaintiff.

Defendant asserts that this instruction was erroneous in that it: (1) failed to hypothesize that defendant's "refusal to return the 200 shares of Reece Corporation stock was 'to the exclusion of plaintiff's ownership rights'", and (2) failed to include a paragraph stating that "plaintiff was thereby damaged."

We first address defendant's contention that the instruction should have contained language to the effect that defendant's refusal to return the certificates was "to the exclusion of plaintiff's ownership rights." Defendant's point is without merit. While there are cases where language similar to the above is used in *defining* conversion, *see, e.g., Houston v. Columbia Federal Savings and Loan Ass'n,* 569 S.W.2d 211, 214 (Mo.App.1978), it is not an element of conversion or an ultimate fact which must be submitted to the jury.

We now address the absence of language hypothesizing causation of damages, an inquiry which necessitates further consideration of the nature of the tort of conversion and its elements. In modern law, conversion "is an intentional exercise of dominion

or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." (Citation omitted). *Breece,* 556 S.W.2d at 709. As we have previously noted, it is well established that conversion may be proved in one of three ways: (1) by tortious taking; (2) by any use or appropriation to the use of the person in possession indicating a claim of right in opposition to the rights of the owner; or (3) *by refusal to give up possession to the owner on demand. Id.; Arnold,* 541 S.W.2d at 30.

 Plaintiff's verdict director, based upon defendant's refusal to surrender possession of plaintiff's stock, submits the necessary elements of conversion. There is nothing in the definition of conversion or the methods of establishing it which indicates that damages must actually be caused. Indeed, it has been repeatedly held that "where a conversion is established plaintiff is entitled ... at least to nominal damages." *Jackson v. Engert,* 453 S.W.2d 615, 617 (Mo.App.1970); *Schulte,* 370 S.W.2d at 626.[4] Thus, it is clear that the emphasis is on the nature of the act of conversion, not its result.

It is worth noting that although there is no MAI instruction on conversion, MAI 3rd cites to *Fireman's Fund Ins. Co. v. Trippe,* 402 S.W.2d 577 (Mo.App.1976), for a "[p]roper not-in-MAI verdict director in action for conversion." MAI 3rd at LXXXIV. A review of the instruction in that case reveals that it did not contain language regarding causation.

The facts hypothesized in plaintiff's verdict directing instruction, if believed by the jury, were sufficient to entitle plaintiff to at least nominal damages, and the trial court did not err in the giving of the in-

struction. Plaintiff's damage instruction, which is not challenged on appeal, is in accordance with the previously discussed law regarding the measure of damages once conversion is established. Defendant's attack on plaintiff's verdict directing instruction is without merit.

Judgment affirmed.

DOWD, P.J., and CRIST, J., concur.

---

4. That no actual loss need be established is recognized in *Jordan v. Ebert,* 387 S.W.2d 255, 257 (Mo.App.1965), the case relied upon by defendant. Although we stated there that evidence of damages is necessary in a conversion case, we observed: "[w]ith respect to damages it should be noted that * * * [a]lthough no actual loss is shown, if there has been a technical conversion the defendant is liable for at least nominal damages." (Citations omitted). *Id.* We do not read *Jordan* as requiring that the jury be instructed on causation. Rather, the language in that case appears to apply to evidence of the *amount* of damages, i.e. the fair market value of the converted property at the time of conversion, since without such evidence actual damages could not be determined.