Ruth Houck LUCAS, individually and
as assignee of the Estate of
Wilder Lucas, Appellee,

v.

Wilder George LUCAS, Appellee,

Oppenheimer & Co., Inc., Appellant.

Ruth Houck LUCAS, individually and
as assignee of the Estate of
Wilder Lucas, Appellee,

v.

Wilder George LUCAS, Appellant.

Oppenheimer & Co., Inc.

Nos. 90–1287, 90–1287.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 7, 1991.

Decided Sept. 25, 1991.

Rehearing and Rehearing En Banc
Denied Oct. 31, 1991.

Lindsey Miller–Lerman, Omaha, Neb., argued (Curt Roy Hineline and Ronald R. Massumi, Omaha, Neb., and P. Terence Crebs, St. Louis, Mo., on brief), for appellant in No. 90–1287.

Anthony S. Bruning, St. Louis, Mo., argued (Edward M. Roth, on brief), for appellees.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,[*] District Judge.

JOHN R. GIBSON, Circuit Judge.

Oppenheimer & Company, Inc., and Wilder George Lucas appeal from a judgment based on a jury verdict in favor of Ruth Houck Lucas, individually and as assignee of the claims of the estate of her husband, Wilder Lucas. Ruth Lucas brought this diversity action against Oppenheimer & Company, Inc., and her son Wilder George Lucas for the conversion of securities from her husband's estate. On appeal, both Oppenheimer and Wilder George Lucas make essentially the same arguments: (1) that Ruth Lucas lacked standing to bring this action, (2) that she failed to make a submissible claim for conversion, (3) that the district court erred in instructing the jury on affirmative defenses, and (4) that the jury instructions regarding a power of attorney and damages were in error. Oppenheimer asserts an additional claim that the district court erred in failing to direct a verdict against Wilder George Lucas on its cross-claim. We affirm judgment in favor of Ruth Lucas, and the award of punitive damages, but remand for retrial of the

[*] The HONORABLE HOWARD F. SACHS, Chief United States District Judge for the Western District of Missouri, sitting by designation.

actual damage issue under proper evidence and instructions in accordance with this opinion.

Wilder Lucas died on November 2, 1983. His will named his wife, Ruth Lucas, as executrix of his estate. Mrs. Lucas authorized her son, Wilder George Lucas, to assist in the administration of the estate. Wilder George Lucas lives in Tennessee, and during the two years after his father's death he made between 50 and 60 trips to St. Louis to work on estate matters.

At his death, Wilder Lucas owned various securities worth approximately $360,-000. It was his practice to store the certificates of ownership randomly throughout his business office. Ruth and Wilder George Lucas began locating and consolidating those securities in order to close out the estate. Wilder George Lucas hired the secretary who had worked for his father and an accountant to assist him, and conducted affairs out of his father's office.

In December 1983, Mrs. Lucas executed a "durable power of attorney" giving Wilder George Lucas authority to act on her behalf. The drafting attorney testified that the purpose of this general power of attorney was to enable Wilder George Lucas to handle Mrs. Lucas's personal affairs. Wilder George Lucas testified that he believed the power of attorney also authorized him to act for his mother in her role as executrix.

Wilder George Lucas set to work administering his father's estate. He placed his father's investments in accounts at the brokerage firms of Newhard, Cook & Co., Inc. and Merrill, Lynch, Pierce, Fenner & Smith, Inc. Using the power of attorney and other forms signed by his mother, Wilder George Lucas directed the brokerage firms to transfer his father's securities first into the name of the estate, and then into street name so that the stock certificates would be held in trust at the Depository Trust Company.

At various times, Wilder George Lucas traded the securities in these accounts, and in the summer of 1984 he instructed Newhard Cook and Merrill Lynch to transfer all remaining securities to accounts at Oppenheimer,[1] where he continued active trading. There is little evidence regarding whether Oppenheimer obtained, or tried to obtain, Mrs. Lucas's authority to open these accounts on behalf of the estate.

Periodically, Wilder George Lucas would instruct Oppenheimer to transfer the proceeds from the sale of securities to an estate checking account at Centerre Bank.[2] Oppenheimer claims that it wired funds totalling $231,000 to this account. It also claims that Wilder George Lucas instructed the brokerage firm to wire approximately $119,000 to E & W, Inc., a Tennessee textile company that his wife owns, and of which he is president and CEO. Additionally, it is undisputed that $81,000 was wired back from the estate checking account to Oppenheimer.

In November 1985, anxious to close the Wilder Lucas estate, the estate attorneys asked Wilder George Lucas to provide a list of all receipts and disbursements of the estate, along with a list of the estate's remaining assets. Wilder George Lucas informed the attorneys that the estate's assets consisted of about $50,000 and a note from him to the estate for several hundred thousand dollars.

The attorneys subsequently discovered that Wilder George Lucas had used Oppenheimer to liquidate the estate securities and to transfer the money to the estate checking account. He had then used blank checks that his mother had signed to pay

---

1. Wilder George Lucas opened the first Oppenheimer account in July of 1984 on margin, using the promise of transferring stock from Newhard Cook and Merrill Lynch as collateral for the loan. Lucas opened a second account in November as a risk arbitrage account. It is undisputed that the value of the securities transferred into the account was approximately $251,000, and that the account generated approximately $18,000 in profits.

2. Mrs. Lucas directed the estate attorneys to open an estate checking account at Centerre Bank as a conduit for estate financial affairs. Mrs. Lucas testified that she signed some 200 estate checking account checks in blank, and gave them to her son with the expectation that he would give them to the estate attorneys to pay estate debts.

most of the money from the estate checking account to himself or E & W.[3]

When she learned what her son had done, Mrs. Lucas revoked the durable power of attorney and wrote a letter dated April 4, 1986, notifying Oppenheimer that the power of attorney under which her son had been purporting to act was no longer in force.

The estate attorneys advised Mrs. Lucas that the co-trustee of the estate, Boatmen's Bank, would probably seek to hold her liable for the value of the securities missing from the estate. In response, Mrs. Lucas transferred approximately $341,000 [4] worth of her own securities to the estate, and in exchange for this payment, Mrs. Lucas, acting as executrix, assigned herself, personally, the estate's right to recover the value of the missing securities.[5]

Mrs. Lucas then filed this diversity action against Oppenheimer and Wilder George Lucas. At the close of the thirteen day trial, the court instructed the jury members that they should find for plaintiff if Oppenheimer "came into possession and control of an interest in stock certificates of the estate of Wilder Lucas without the authority of plaintiff," and the estate was thereby damaged. The court also instructed the jury that as a matter of law, the power of attorney in evidence could not "authorize anyone to do anything on behalf of the estate of Wilder Lucas," and that the jury was "not to consider the power of attorney as evidence of defendant Wilder George Lucas's alleged authority to act on behalf of the Estate." The district court refused Oppenheimer's requested instructions on the defenses of ratification, acquiescence, waiver, estoppel and inherent authority, but did give an instruction on apparent authority. The jury returned a verdict against George Wilder Lucas for $610,000 in actual damages, and against Oppenheimer for $510,000 in actual damages and $510,000 in punitive damages.

## I.

■ Oppenheimer claims, for the first time on appeal, that Mrs. Lucas lacked standing to bring this conversion claim because she did not sue in her role as executrix. Mrs. Lucas answers that she brought the suit in her personal capacity because while acting as executrix she assigned the cause of action to herself.

We do not believe this is a standing problem, but rather one of identifying whether the real party in interest is Mrs. Lucas as executrix, or Mrs. Lucas in her personal capacity.[6] If Oppenheimer was concerned that Ruth Lucas, individually, was not the correct party to raise the conversion claim, it should have raised the

3. At trial, Wilder George Lucas explained his actions by alleging an agreement with his mother, whereby she agreed to pay $550 per day for his help administering the estate. According to Lucas, he could withdraw money from the estate as he needed it, and to the extent that he withdrew more than he earned in wages, the excess would be treated as a loan from the estate to him. Mrs. Lucas denied that any such agreement ever existed.

4. Although Mrs. Lucas originally transferred $370,957.59 worth of her own securities into the estate, that figure included approximately $30,000 worth of securities that were simply missing and not accounted for when the estate was closed. Mr. Chasnoff, one of the estate attorneys, testified that Mrs. Lucas was able to recover the "missing" securities by having the issuing companies issue replacement certificates. Mrs. Lucas kept these reissued securities for herself, so that in fact she only paid the equivalent of approximately $341,000 into the estate.

5. The assignment stated in part:

The Estate of Wilder Lucas, Deceased, for valuable consideration, receipt whereof is hereby acknowledged by these presents, sells, assigns and transfers to Ruth Houck Lucas the following: (i) all its right, title, interest and claim of every kind and nature whatsoever against Wilder G. Lucas and against each and every person with whom he may have dealt as purported attorney or otherwise with respect to assets of said estate....

6. "Standing" is a constitutional doctrine regarding one's right to challenge a governmental action. R. Whitten, Civil Procedure 472 (1990). If a party lacks standing to bring a claim, a federal court may dismiss the claim under Fed. R.Civ.P. 12(h)(3) "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter...." Because Oppenheimer's argument actually pertains to the real party in interest, rather than standing, its claim was untimely raised and, hence, waived.

issue before or during trial. We have often stated that we will not consider issues raised for the first time on appeal, and this case does not present grounds for an exception to the general rule. *Morrow v. Greyhound Lines, Inc.,* 541 F.2d 713, 724 (8th Cir.1976) ("It is old and well settled law that issues not raised in the trial court cannot be considered by this court."); *see Gogolin & Stelter v. Karn's Auto Imports, Inc.,* 886 F.2d 100, 102 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990) (real party in interest defense is waived if not timely asserted).

## II.

Oppenheimer next argues that Ruth Lucas failed to make a submissible claim of conversion. Our standard of review on this claim is narrow. This being a diversity case, we must examine issues of Missouri law de novo. *Salve Regina College v. Russell,* — U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). On the other hand, we must assume as true all facts in Mrs. Lucas's favor that the evidence tends to prove, and, giving her the benefit of all reasonable inferences, we must resolve direct factual conflicts in favor of Mrs. Lucas. *Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1218 (8th Cir.1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

In Missouri, a plaintiff can prove conversion "in one of three ways: (1) by tortious taking; (2) by any use or appropriation to the use of the person in possession indicating a claim of right in opposition to the rights of the owner; or (3) by refusal to give up possession to the owner on demand." *Lacks v. R. Rowland & Co.,* 718 S.W.2d 513, 521 (Mo.Ct.App.1986) (emphasis removed). Mrs. Lucas alleged conversion by tortious taking.

### A.

Oppenheimer argues that Ruth Lucas did not prove a submissible claim for conversion of securities because the securities in question had been transferred into street name. Oppenheimer contends that an action for conversion is only appropriate where the converted property is chattel capable of being specifically identified. When Wilder George Lucas had Newhard Cook and Merrill Lynch transfer the estate securities to Oppenheimer, the firms did not send the stock certificates because the certificates were being held by the Depository Trust Company. Instead, they transferred the securities by book entry. Oppenheimer argues that because the securities positions arrived by book entry, they were intangible property, incapable of being the subject of an action for conversion.

■ The precise legal question is whether an estate's ownership interest in securities can be the subject of an action for conversion when that interest is evidenced by a computerized book entry rather than by the transfer of stock certificates.

■ Stock certificates are not the property at issue but are only symbols representing ownership of the underlying shares of stock. *Richardson v. Shaw,* 209 U.S. 365, 378, 28 S.Ct. 512, 516, 52 L.Ed. 835 (1908). *See Lacks,* 718 S.W.2d at 517 (court agreed to treat wrongful taking of certificates as conversion of the property even though the certificates are mere symbols of the underlying stock). Whether or not the owner of a security possesses the certificate, that person still holds the exclusive right to collect dividends, accumulate equity (and the risk that the security's value may fall), transfer from one brokerage to another, require the trustee or issuer to provide a certificate indicating ownership, and dispose of the security. The fact that a holding agent such as the Depository Trust Company possesses the certificate does not diminish the fact that the shareholder owns the security. *See Richardson,* 209 U.S. at 377–78, 28 S.Ct. at 515–16; *Lacks,* 718 S.W.2d at 519 n. 3. *Accord East v. Crowdus,* 302 F.2d 645, 650 (1962); *Louisiana State Sch. Lunch Employees Retirement Sys. v. Legel, Braswell Gov't Sec. Corp.,* 699 F.2d 512, 514–15 (11th Cir.1983) ("A security may be delivered without the purchaser's taking physical possession"); *Matthysse v. Sec. Processing Serv., Inc.,*

444 F.Supp. 1009, 1019–20 (1977) (S.D.N.Y.1977) (same). The widespread use of clearing agents and computerized book entry systems has removed the need for shareholders to possess or transfer stock certificates. We reject Oppenheimer's claim that the interests it received from the estate were not capable of being the subject of conversion.

## B.

■ Oppenheimer argues that the trial court should not have submitted the case to the jury on conversion because Mrs. Lucas never made any showing that she had, individually or as assignee of the estate of Wilder Lucas, an immediate right to possess the decedent's property at the time of the alleged conversion. *See Osborn v. Chandeysson Elec. Co.*, 248 S.W.2d 657 (Mo.1952).

At the time her son transferred the estate securities to accounts at Oppenheimer, Mrs. Lucas as executrix had an immediate right to possess those securities. Mo.Rev. Stat. § 473.263.1 (1986). That immediate right of possession supported her right as executrix to sue for conversion. On August 26, 1986, Mrs. Lucas, as executrix, assigned the right to sue to herself personally, and it is that assignment upon which she now relies to bring this action. Oppenheimer argues that the assignment is a nullity because, by its language, the assignment only gave Ruth Lucas the rights of the estate, not the rights of the executrix, and in Missouri an estate is not a legal person able to maintain a lawsuit.

This argument draws an overly narrow distinction between the rights of the estate and the executrix. Ruth Wilder, as executrix, represented the estate, and had a right to possess all personal property belonging to it. The assignment she executed on behalf of the estate assigned all "right, title interest and claim of every kind and nature whatsoever ... with respect to the assets of [the] estate" to Ruth Lucas personally. The assignment conveyed the present cause of action to Mrs. Lucas.

## C.

■ Oppenheimer argues that the district court should not have submitted conversion to the jury because Mrs. Lucas did not establish that Oppenheimer (1) tortiously took the securities, (2) used or appropriated them in opposition to the rights of the estate,[7] or (3) refused to give up possession in the face of a demand. The latter two arguments are irrelevant since Mrs. Lucas submitted her claim based only upon the first theory of liability.

The jury found for Mrs. Lucas on an instruction based on a tortious taking. Under the governing standard of review, we must affirm the district court's decision to submit this case to a jury unless we conclude that, viewing all facts in the light most favorable to Mrs. Lucas, there was simply no evidence from which the jury could find a tortious taking. *Craft*, 766 F.2d at 1218.

■ In order to establish a submissible claim of tortious taking, Mrs. Lucas had to introduce evidence tending to show that Oppenheimer wrongfully took possession of the estate securities, for itself or for the benefit of a third party. Restatement (Second) of Torts § 229, 221(a) and comment (b) (1965). Mrs. Lucas introduced evidence

---

7. Oppenheimer argues that Mrs. Lucas has no claim of conversion because it took custody of the securities as an innocent bailee, and "never asserted an interest of *its own* in opposition to those of the rightful owner." This is simply an extension of the argument that Oppenheimer never used or appropriated the securities indicating a claim of right in opposition to that of the estate. *See Schulte v. Florian*, 370 S.W.2d 623, 626 (Mo.Ct.App.1963) (that defendant made no claim of ownership of the property only goes to the degree of his offense, not to whether there was a conversion).

We would also observe that the innocent bailee defense is only available if the bailee does not have adequate notice of the right of the real owner. *Glass v. Allied Van Lines, Inc.*, 450 S.W.2d 217, 220–21 (Mo.Ct.App.1970). When Oppenheimer took delivery of the securities, it had ample notice that they belonged to the estate, and not to Wilder George Lucas, thus providing the basis for a jury to conclude that Oppenheimer was not an innocent bailee.

that Oppenheimer assumed possession and control of the securities at the direction of Wilder George Lucas without her authorization or consent. With this showing, Mrs. Lucas made a submissible case for conversion by tortious taking.

### III.

Oppenheimer argues that the district court erred when it refused to instruct the jury on the affirmative defenses of ratification, acquiescence, waiver, estoppel and inherent authority.

"A district court has wide discretion in formulating appropriate jury instructions." *Davis v. Merrill Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1212 (8th Cir.1990). A reviewing court is "only required to determine whether the instructions, when taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately present the issues in the case...." *Id.* (citation omitted).

Wilder George Lucas argues in his brief the error in refusing the affirmative defense instructions. However, he does not point to any place in the trial record where he preserved this error either by proper objection or by offering such instructions. Similarly, Oppenheimer's answer did not plead the inherent authority and acquiescence theories. While Oppenheimer argues that it unsuccessfully sought leave to amend the pleadings to conform to the evidence, it does not direct us to that portion of the record in which this ruling was made, and our search in the record of the proceedings at the conclusion of the evidence was not fruitful. This alone would be ground for rejecting Oppenheimer's argument. As we have said, "We were not required to search the record for error." *United States v. Cohen*, 738 F.2d 287 (1984) (citations omitted). Nonetheless, we will evaluate the substance of these arguments.

■ Oppenheimer's proposed jury instruction on inherent authority required a finding that the transactions at issue involved the type of actions intended by plaintiff, or that plaintiff authorized Wilder George Lucas to enter into the transactions of the type at issue in this case. Our study of the record reveals no evidence that could support such a finding. The proposed instructions on acquiescence required findings that Mrs. Lucas was aware of and acquiesced in the activities of Wilder George Lucas in engaging in the transactions at issue. Our study of the record does not reveal that there was evidence to support such findings, and we conclude that the district court did not err in refusing these instructions. It is also of interest that these instructions, as well as the other affirmative defense instructions, are directed to the activities and transactions, and not to the submitted ground of conversion that Oppenheimer came into possession and control of the stock certificates without the authority of Mrs. Lucas.

■ Oppenheimer affirmatively pleaded the defenses of ratification, waiver, and estoppel in its answer to Mrs. Lucas's second amended complaint. Nevertheless, we affirm the district court's decision not to submit these defenses because Oppenheimer did not introduce evidence that Mrs. Lucas had full and complete knowledge of her son's activities, and such a showing was essential to Oppenheimer's ability to prove each defense. *See, e.g., Hyken v. Travelers Ins. Co.*, 678 S.W.2d 454, 459 (Mo.Ct.App.1984) (ratification); *Stenger v. Great S. Sav. & Loan Ass'n*, 677 S.W.2d 376, 383–84 (Mo.Ct.App.1984) (estoppel); *Greenberg v. Koslow*, 475 S.W.2d 434, 438 (Mo.Ct.App.1971) (waiver); *State v. Shain*, 339 Mo. 621, 98 S.W.2d 690, 692 (Mo.1936) (waiver and ratification).

The strongest testimony supporting the requested defense instructions appears in the direct examination of Wilder George Lucas. He testified that he discussed with his mother the possibility of Oppenheimer's working as a broker for the estate, and of investing in its arbitrage pool, and, that if she felt it advisable, to begin more active trading of securities. He stated that she answered yes, that this would be a good idea, and he further informed her of plans to go to Chicago to discuss this with Oppenheimer and asked her to go along but

she refused. Wilder George Lucas's testimony establishes that his mother may have had some knowledge of establishing an account at Oppenheimer, but it falls short of demonstrating that Mrs. Lucas had full and complete knowledge of her son's conduct.

The testimony does not suggest that Wilder George Lucas explained to his mother he was opening the first Oppenheimer account on margin, or that he was using estate securities as collateral for the $100,-000 margin loan. Nor is there evidence establishing that Mrs. Lucas knew her son was engaging in daily high volume trading of estate securities, that he had entrusted Oppenheimer to make trading decisions on behalf of the estate securities that were in the arbitrage account, that he was directing Oppenheimer to transfer the proceeds from the sale of estate securities to his wife's company in Tennessee, or that he was using the blank checks she had signed to pay himself and to borrow money from the estate.

The requested instructions on these three theories all submitted that Mrs. Lucas was aware of her son's activities and of the transactions in which he engaged. Without evidence that Mrs. Lucas had such knowledge, Oppenheimer and defendant Lucas were not entitled to jury instructions on ratification, waiver or estoppel.

### IV.

Oppenheimer claims the district court committed reversible error when it instructed the jury that "as a matter of law, this power of attorney cannot authorize anyone to do anything on behalf of the Estate of Wilder Lucas, Ruth Lucas, Executrix." Oppenheimer first argues that the language of the power of attorney was ambiguous, creating a jury question as to the scope of its authority.

■ "Missouri courts ... insist on strict construction of powers of attorney and refuse to infer broad powers from instruments that inadequately describe the property with which the agent is to deal." *Mercantile Trust Co. v. Harper*, 622

S.W.2d 345, 350 (Mo.Ct.App.1981) (citations omitted). Under Missouri law, to authorize the sale or transfer of a principal's securities, a power of attorney must explicitly state its subject matter and purpose. *Id.* The fact that Oppenheimer concedes the power of attorney is ambiguous, alone, would be sufficient grounds for the district court to conclude that the power of attorney did not authorize Wilder George Lucas to transfer or sell estate securities. The text of the power of attorney does not suggest that Mrs. Lucas was attempting to transfer to her son any authority she might hold in a representative capacity. It appears to be limited to her personal affairs and property. Thus, the trial court correctly held, ruling as a matter of law under *Mercantile Trust*, that the power of attorney was too general to authorize Wilder George Lucas to act on behalf of the estate.

Oppenheimer argues that even if the power of attorney did not create actual authority, the court's instruction was erroneous because it precluded the jury from considering the fact that Mrs. Lucas executed the power of attorney as evidence of apparent authority.

■ We do not read Missouri law to authorize the jury to infer apparent authority from the power of attorney if that document did not create actual authority. In *Mercantile Trust*, the Missouri Court of Appeals explained that far from acting as an indication of apparent authority where actual authority does not exist, a broad power of attorney should be the equivalent of a bell or signal, warning brokers to be cautious in handling their customers' affairs. *Id.*

■ Nevertheless, the district court's instruction about the validity of the power of attorney did not prevent the jury from considering whether Mrs. Lucas's actions created apparent authority. Immediately after the court instructed the jury about the power of attorney, the court gave a thorough apparent authority instruction.[8]

8. The court stated:

Now one of the issues you must decide on,

The court instructed the jury that it should consider whether Mrs. Lucas placed her son in a position that would allow Oppenheimer to justifiably assume that he had authority to trade estate securities.

As we stated in *Davis:*

When reviewing jury instructions, we are only required to determine whether the instructions, when taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately present the issues in the case.... "[T]he fact that the instructions are technically imperfect or are not a model of clarity does not render the charge erroneous."

*Davis,* 906 F.2d at 1212 (citations omitted). The district court correctly instructed the jury that the power of attorney did not create actual authority. The instruction was not error, nor did it prevent the jury from considering whether Mrs. Lucas's actions created apparent authority.

### V.

The district court entered judgment against Wilder George Lucas in the amount of $610,000 for actual damages. In a separate paragraph, the order also entered judgment against Oppenheimer for $510,-000 in actual damages and another $510,-000 in punitive damages. Oppenheimer argues that the wording of the judgment order is unclear as to whether Mrs. Lucas is entitled to recover actual damages from the defendants jointly or whether the actual damage awards stand against each defendant separately.

Mrs. Lucas acknowledged that the upper limit on actual damages should be $610,000 rather than $1,120,000, in a motion she filed with the district court,[9] so that we find no disagreement between the parties on this issue.

We are concerned, however, both with the instruction and the record's support for the jury award of actual damages against Oppenheimer. We are further troubled by the fact that Mrs. Lucas claims damages of $610,000, and yet she only delivered to the estate $341,000 [10] worth of securities when she purchased the right to bring this action.

■■■ Oppenheimer's first argument is that the district court erred in failing to instruct the jury that it could return damages for no more than $38,000 plus a reasonable value for the loss of use.[11] This argument, in essence, urges that as a matter of law actual damages were limited to $38,000, the amount Oppenheimer concedes it did not return to the estate checking

---

members of the jury, is whether the plaintiff was bound by the actions of Wilder George Lucas.

And in deciding this issue, the burden of establishing the essential facts is on Oppenheimer and Company, Incorporated.

And you may consider whether the plaintiff placed Wilder George Lucas in such a situation that a person of ordinary prudence, familiar with business usages, and the nature of the particular business, would be justified in assuming that this person had authority to perform a particular act and deals with the apparent agent upon that assumption.

And from these circumstances, if you believe that the defendant Oppenheimer was justified in assuming that Wilder George Lucas had the authority to act as he did, then you should find that the plaintiff is bound by the acts of Wilder George Lucas, and your verdict in such event must be for the defendant Oppenheimer.

**9.** The motion stated:

[The] Court's judgment as entered *did not* award the Plaintiff actual damages of $1,120,-000.00. The plaintiff was awarded total actual damages of $610,000.00 plus interest.

These actual damages are in the form of two judgments: Oppenheimer for $510,000.00 and Wilder George Lucas for $610,000.00. Any amount *over* $100,000.00 collected from Defendant Lucas also begins to satisfy the judgment against Oppenheimer. Hence, the Plaintiff can *only* collect a grand total of $610,000.00 plus interest in actual damages from both defendants as a group.

**10.** See *supra* note 4.

**11.** The jury instruction provided in full:

If you find in favor of plaintiff, on her claim against Oppenheimer & Company, Inc., then you must award plaintiff such sum as you may find from the evidence to be the fair market value of the Estate of Wilder Lucas stock certificates at the time of the conversion, plus such sum as you may find from the evidence will fairly and justly compensate the Estate of Wilder Lucas for the loss of use thereof.

account.[12] We have little difficulty rejecting this argument.

There was evidence Oppenheimer returned a total of $231,000 to the estate checking account. Thereafter, on June 21, 1985, $81,000 was wired back to Oppenheimer, and thereafter Oppenheimer proceeded to wire $119,000 to E & W in three separate transfers. Whether actual damages against Oppenheimer should be limited to $38,000 or $119,000 depends on whether Oppenheimer is held liable for the $81,000 wired back to the brokerage. There is a factual dispute as to who authorized the $81,000 wire transfer to Oppenheimer, and this was a question for the jury to decide. Thus, the district court did not err in refusing to instruct that the damages were limited to the $38,000.

Any lingering doubt on this issue is dispelled by Oppenheimer's frequent reference to the loss being "$38,000 (or $119,000)." Oppenheimer makes numerous arguments concerning this $81,000, in part dealing with the authority of Centerre Bank to retransfer the money to Oppenheimer, and these arguments but underscore our conclusion that the amount returned to the estate is a question of fact to be determined by the jury and that a preemptive instruction was not authorized.

We are troubled, however, by Oppenheimer's further argument directed to the damage instruction. In the headings of Oppenheimer's argument, following a general statement that the district court's damage instructions and judgment were in error, counsel specified that "the failure to instruct the jury that plaintiff's actual damages were limited to approximately $38,000 was error." We have already rejected this argument. In the body of the argument, after a general discussion concerning the return of the $231,000, Oppenheimer's counsel state: "Accordingly, the court's use of Instruction 19 and failure to credit Oppenheimer for the funds that were indisputably returned to the Lucas Estate was reversible error." During the course of the argument Oppenheimer refers to its trial objection to the damages instruction (No. 19), and to its request that the court add to Instruction 19 a "tail" stating: "less the amount of funds returned by defendant Oppenheimer and Co., Inc. to the Estate of Wilder Lucas."

■ Federal Rule of Appellate Procedure 28(a)(5) requires that a party's brief set forth "[a] short conclusion stating the precise relief sought." *Id.* In some respects Oppenheimer's brief simply sets forth a general claim of error without pointing out any specific or particular error of the trial court. We condemned such a practice as contrary to our rules in *New York Casualty Co. v. YMCA*, 119 F.2d 387, 389–90 (8th Cir.1941). Some of our later cases, dealing primarily with enforcement of our rules, have evidenced a less stringent requirement, *cf. Andrews v. Olin Matheson Chemical Corp.*, 334 F.2d 422, 428 (8th Cir.1964); *Harris v. Smith*, 372 F.2d 806, 815 (8th Cir.1967). These cases instruct us that we should not take an overly restrictive view of claims of error in a brief. However, we caution counsel that it is desirable to state with accuracy the grounds for relief and to set out with specificity "the precise relief sought." In this case, with numerous sophisticated counsel, it is difficult to comprehend why we have been so troubled with the claim of error, but we trust that our words of concern will be of some guidance in future cases.

■ So considered, we read Oppenheimer's brief to argue that the damages instruction was in error because of its failure to properly consider the funds Oppenheimer returned to the estate. *Lacks* sets forth the measure of damages for conversion of personal property in Missouri as being:

... generally based upon the reasonable market value of the property at the time

---

**12.** Oppenheimer argues that the value of the estate securities was approximately $251,000 at the time they were transferred to Oppenheimer. According to Oppenheimer, Wilder Lucas's investments at Oppenheimer yielded profits of about $18,000. Of the $269,000, Oppenheimer says it returned $231,000 to the estate checking account, before the $81,000 was wired back to Oppenheimer. Oppenheimer concedes that between June 1985 and February 1986, it made three wire transfers to E & W, Inc., for a total of $119,000.

of conversion.... Where property is returned to the owner after the conversion the measure of damages is the difference between the value of the property *at the time of the conversion* and the value at the time of the return, plus the reasonable value for the loss of use of the property.

718 S.W.2d at 520, *citing Breece v. Jett,* 556 S.W.2d 696, 709 (Mo.Ct.App.1977) (emphasis in original).

*Lacks* was recently reaffirmed in *Hoffman Management Corp. v. S.L.C. of North America, Inc.,* 800 S.W.2d 755, 762 (Mo.Ct.App.1990). *Hoffman* approves of an instruction that requires consideration of the factors enumerated in *Lacks,* including the "fair market value after the property was returned to plaintiff's possession." *Id.*

There was evidence Oppenheimer returned $231,000 to the estate checking account. While the property itself in the form of the shares of stock was not returned to the estate, presumably the shares of stock were sold on the open market, and the proceeds from the sale made up the funds transferred to the estate.

The instruction before us refers to the value of the property at the time of conversion, and to the value for loss of use of the property. Under *Lacks* and *Hoffman,* however, the value of the property returned should have been considered by the jury and the instruction omits this element of the conversion damages formula.

The only argument Mrs. Lucas urges regarding actual damages is that Oppenheimer's position is based on intervening cause. This argument has no merit. *Lacks* and *Hoffman* demonstrate that the district court erred in omitting reference of the return of the funds to the estate in its damage instruction.

Oppenheimer also argues that "there is no support whatsoever for the measure of damages used in this case," and argues that the district court committed reversible error in allowing Oppenheimer to be liable for the hypothetical value of the securities' positions five years after the conversion and return of the proceeds. Mrs. Lucas was allowed to offer exhibit 87 showing the securities' values at the time of trial, and dividend payments made from the time Oppenheimer received the securities. Oppenheimer argues that the value of the securities at the time it received them was approximately $251,000, a figure about which there is little dispute, and it argues that the value at the time of trial "could not possibly be relevant."

■ We are again troubled with what claim for relief Oppenheimer is asserting. The brief does not make clear whether Oppenheimer is claiming that it was error to receive the exhibit and related testimony into evidence, or whether Oppenheimer is claiming that the testimony given was insufficient to support the verdict. We will not attempt to ascertain the nature of these arguments. Suffice it to say that plaintiff's exhibit 87 and the testimony concerning it was based upon the value of the stock of the estate on the day of Wilder Lucas's death, October 2, 1983, and the value at the time of trial of those shares of stock that Wilder George Lucas delivered to Oppenheimer plus the dividends that accrued from the time of delivery to the time of trial.

Conceivably, this evidence may have had some tendency to demonstrate the loss of value of the property, but it is inadequate to do so standing alone. This exhibit and the testimony describing it did not treat the elements of conversion damages described in *Lacks* and *Hoffman,* namely, the value of the stock when transferred into the Oppenheimer account, the value at the time of return, and the reasonable value for the loss of use of property.

■ This was a 13–day trial. If, under the practice followed in *In re Knickerbocker,* 827 F.2d 281, 289 (8th Cir.1987), we could ascertain an amount of actual damages sustainable by the record in the district court, we would do so. There is little dispute in the record that $251,000 was the value of the securities when turned over to Oppenheimer in the period July to October 1984, that some $18,000 in profits were generated while at Oppenheimer, and that

returns were made to the Lucas estate. There is a dispute as to the amount returned and an evidentiary void as to the loss of use. We think it best that the issue of actual damages be remanded to the district court for further proceedings under proper instructions and evidence directed to the issues of the fair market value at the time of conversion, less amounts returned to the estate, plus a reasonable value for the loss of use.

 We entertain no question but that the conflicting evidence before the district court concerning the $81,000 return and re-return supported a jury award of actual damages of at least $119,000. We cannot conclude that the jury award of punitive damages must be reduced to this amount. We are satisfied that such an award of actual damages can support the award of punitive damages of $510,000 made by the jury. Thus, our remand is with respect to actual damages only.

The jury also awarded Mrs. Lucas $610,-000 in damages against her son. While there are some statements in the record that Wilder George Lucas joined in some of the objections made by counsel for Oppenheimer, there are no specific objections by him directed to the damage instruction, and there is no indication that he joined in any objections relating to this instruction. It is also true that the conversion claimed against Wilder George Lucas involved an earlier point in time than that involving Oppenheimer, and little question but that a substantial part of the proceeds were directed to his bank accounts or those of corporations in which he had an interest. Wilder George Lucas provides us no basis to reverse the award against him, and he has not offered any alternative basis on which to estimate damages against him.

### VI.

Finally, Oppenheimer argues that the district court erred by refusing to grant Oppenheimer's motion for directed verdict on its cross-claim against defendant Wilder George Lucas. This issue was submitted to the jury and rejected by it. The argument that Oppenheimer was entitled as a matter of law to recover on its cross-claim against George Lucas is without merit.

### VII.

We remand this case for retrial on the issue of actual damages awarded against Oppenheimer, but we affirm the district court's judgment in all other respects.