248 F.Supp.2d 867 (2003)
AMWEST SURETY INSURANCE CO., Plaintiff,
v.
CONCORD BANK, Defendant.
No. 4:00-CV-1988 SNL.
United States District Court, E.D. Missouri, Eastern Division.
February 4, 2003.
*870 Bernard A. Reinert, Aaron G. Weishaar and Issa K. Emeish, Reinert & Rourke, P.C., St. Louis, for Plaintiff Amwest Surety Insurance Company.
Richard E. Coughlin, Gillespie, Hetlage & Coughlin, L.L.C., Clayton, for Defendant Concord Bank.

MEMORANDUM
LIMBAUGH, Senior District Judge.
Plaintiff has filed this multi-count diversity action seeking actual and punitive damages in connection with the alleged wrongful dishonor of a "letter of credit" it presented to the defendant. Plaintiff seeks legal redress for the alleged wrongful dishonor of a sight draft drawn on the letter of credit, as well as for conversion. This matter is before the Court on the plaintiffs motion for summary judgment (# 85), filed April 30, 2002. This cause of action is set for trial on the Court's trial docket of February 10, 2003.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." ML Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);
*871 Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Butter v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem., Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to an examination of the facts.
On October 25, 1999 defendant Concord Bank issued an Irrevocable Letter of Credit (hereinafter referred to as the Letter of Credit or LOC) in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00) to plaintiff Amwest Surety as beneficiary. The LOC was established and issued at the request of defendant's loan customer, CMR Construction, Inc. (CMR). The LOC was a condition precedent to the issuance of performance and payment bonds by Amwest, as surety, on behalf of CMR, as principal, to secure the performance of a construction project known as the Argyle Parking Garage for which CMR was the general contractor. The LOC was provided as collateral security for the performance and payment bonds issued by Amwest, as surety, for CMR, as principal, to the City of St. Louis, as obligee in connection with the construction of the Argyle Parking Garage in St. Louis, Missouri.
The LOC provides in pertinent part:
"You may draw hereunder by means of your drafts on us at sight accompanied by the following written certification: This Irrevocable Letter of Credit was taken as collateral on the bond(s) for the above-mentioned principal. As of this date, we have not been released of liability by the obligee and/or claims have been made against the bond(s). The proceeds of our draft will be retained and used by Amwest. In the event our liability under our bond(s) is satisfied, Amwest will refund to you the amount paid, less any amounts which may have been paid by Amwest in the interim under our bond(s) and for any unpaid premium due Amwest on said bond(s). We engage with you that all drafts drawn under and in compliance with the terms of this credit will be duly honored if presented at this office on or before October 25, 2000 or any automatically extended date as herein before set forth. We confirm credit and hereby undertake that all drafts drawn and presented will be duly honored by us within fifteen days of receipt."
Furthermore, pursuant to the terms of the LOC, the LOC was subject to the "Uniform Customs and Practices for Documentary Credit (1993 Revision), International Chamber of Commerce, brochure no. 500".
The initial term of the LOC was for one year ending October 25, 2000. However, the LOC was extended automatically by its terms, without amendment, to October 25, 2001. The automatic extension was confirmed September 1, 2000 by letter from Amwest to Concord Bank, with acquiescence to the extension by Dennis Geoghegan, President of Concord Bank.
In addition to the subject LOC, certain other contractual documents were executed among parties to the Argyle Parking Garage project. As part of the project management, all funds paid by the City of St. Louis for the project were to be disbursed by a professional construction disbursement company and no funds were to be paid directly to CMR except for sums approved by the Construction Manager for the City, and then, only through the *872 disbursement company. To facilitate this financial arrangement, CMR, Amwest Surety, St. Louis Disbursing Corp., and Contractor Disbursement Services (CDS) entered into a Disbursement Agreement. Furthermore, the City executed a "Letter of Direction", as an attachment to the Disbursement Agreement, directing that all payments made under the construction contract be sent to Enterprise Bank for deposit in an account opened for purposes of the Disbursement Agreement.[1]
Despite the Disbursement Agreement and the Letter of Direction, during the spring and summer of 2000, the City made two payments (totaling $80,000.00) directly to CMR instead of depositing same in Enterprise Bank for disbursement by CDS.[2] St. Louis Distribution Corp. notified the City of the improper payments and warned that any further misdirected payments would jeopardize coverage under the bonds. Unfortunately, the warning was not heeded, and again in September 2000, the City misdirected payments in the amount of $481,122.90 to CMR directly. Said payments were to cover labor and materials furnished in July 2000. By October 2000, relations had fallen apart among the Argyle Garage Project parties, and the project closed down.
On November 15, 2000 plaintiff advised defendant that it was considering paying on the performance bond having decided that its liability (under the performance bond) would only be released "pro tanto " by the City's actions[3]. It further advised defendant that Amwest had received written notice from subcontractors and vendors stating their intention to file claims on the labor and material payment bond.
On November 17, 2000 plaintiff presented a sight draft drawing on the LOC in the amount of $1,200,000.00, the face value of the LOC. With the sight draft, Amwest presented the written certification as specified in the Letter of Credit. After receipt of the sight draft and accompanying documentation, defendant sent same to its attorney who advised the Bank not to fund the LOC. On December 5, 2000, more than fifteen (15) days after defendant's receipt of the plaintiffs sight draft and accompanying documents (original LOC and the certification statement), defendant, through its attorney, sent notice to plaintiff that defendant was dishonoring the November 17, 2000 sight draft for failure to meet the terms and conditions of the LOC.
Concord Bank's notice of dishonor of the draft drawing upon the LOC stated in part:
"As you know, one of the terms and conditions of the letter of credit is that `Amwest has not been released of liability by the obligees.' Despite your certification to the contrary, it is apparent that Amwest has, in fact, been released by the obligor [sic]. As a result, we are dishonoring your draft dated November 17, 2000.
Concord Bank is basing its decision upon information, in part, which is well known and documented by Amwest."
Concord Bank then proceeded to support its decision by referencing remarks made *873 by Amwest's investigator, and attaching copies of a letter dated May 8, 2000 from St. Louis Disbursing Corp. to the City's Treasurer's Office, and a letter dated October 13, 2000 from CDS to CMR. These letters inform the City of its misdirection of payments to CMR, and finally, of CMR's default of the Distribution Agreement by retaining these misdirected funds and not paying the subcontractors for labor and materials. Finally, defendant contends that contrary to the plaintiffs certification, based upon a vague citation to the case of Prairie State National Bank of Chicago v. United States,[4] plaintiff has been released from liability due to the City's misdirection of payments in connection with the Argyle Garage Project. Nowhere in its notice of dishonor does defendant state or allude to plaintiffs financial condition and ability to refund excess funds (under the LOC) as a reason for its dishonor of the sight draft.
As of the date of the filing of this lawsuit, defendant Concord Bank has retained the original LOC, along with the sight draft and accompanying documentation, in its files. As of the date of the filing of this lawsuit, defendant (through its officers) has made no overtures to plaintiff regarding the return of said documents to plaintiff.
On December 15, 2000 Amwest filed its complaint for wrongful dishonor of a letter of credit, conversion, declaratory and injunctive relief, as well as, exemplary and punitive damages. As part of its prayer for declaratory relief, plaintiff seeks that 1) the Court declare that Amwest has done all that is necessary to entitle it to payment of its sight draft on Letter of Credit No. 10291131 of defendant Concord Bank, and 2) the Court declare that defendant Concord Bank's grounds for dishonor of Amwest's sight draft drawing on Letter of Credit No. 10291131 are legally insufficient and that the sight draft must be honored.
In response to the complaint, defendant Concord Bank has filed an answer[5] and its counterclaim for declaratory relief.[6] Among its affirmative defenses, defendant contends that it has properly dishonored the sight draft because plaintiff has committed fraud as defined in U.C.C. § 5-109 in that contrary to its certification, plaintiff has been released from liability due to the City's actions, and furthermore, that due to its financial situation [7] it would not be able to return any excess funds to the defendant. In its counterclaim, defendant again asserted its affirmative defense of fraud under the U.C.C. and sought, in pertinent part, a declaration:

*874 "(a) That the actions of the City of St. Louis breaching its agreements with respect to payment of funds for the project constituted a material breach of its obligations to Amwest;
(b) That the aforesaid actions by the City of St. Louis led to or caused all of the damages it claimed and caused the increased cost with respect to the Argyle Parking Garage project;
(c) That as a result thereof Amwest was released from any obligations under its Payment and Performance Bonds;
(d) That the November 17, 2000 certification by Amwest to Concord Bank was false and fraudulent in that Amwest had been released from its liability by the obligee, that the certification was further false and fraudulent in that at the time of the presentation of the sight draft Amwest was and would be incapable of refunding any funds to Concord Bank in the event cost of completion was less than the amount paid by Concord;
(e) That Concord Bank properly dishonored the November 17, 2000 sight draft for the aforesaid reasons; and
(f) such further and other relief as the Court deems proper under the premise."
Plaintiff asserts that it is entitled to summary judgment on all counts. It argues that under Missouri UCC law and the UCP 500 it has met the required standard of strict compliance with its November 17, 2000 presentation of the sight draft and certification. It further argues that the defendant's failure to honor the presentation based upon defendant's review of the underlying contractual relationships and events violates the firmly established letter of credit rule known as the "independence principle". It further contends that the defendant's notice of dishonor was untimely, and furthermore, the untimeliness of the dishonor precludes the defendant from not arguing any other cause for dishonor not stated in the notice. It further contends that, assuming the certification was incorrect as to the release of liability, defendant should have still honored the sight draft on the alternative basis; i.e. at the time of the presentation, claims on the payment bond had been made against Amwest. Finally, Amwest contends that the defendant's failure to return the original sight draft and certification constitutes conversion under Missouri law. Defendant argues that its notice of dishonor was timely because said dishonor was based upon defendant's assertion that the certification was fraudulent. Defendant further contends that only in the absence of fraud does the "independent principle" apply. Finally, defendant contends that plaintiff has failed to prove the required elements of conversion because plaintiff never sought the return of the sight draft or the certification.
A "letter of credit" (LOC) is an arrangement by which a customer engages a bank (or other person) to honor a draft (or some other negotiable instrument) for payment by a third-party beneficiary upon compliance with conditions specified in the letter of credit. Bank of Newport v. The First National Bank and Trust Company of Bismarck, 687 F.2d. 1257, 1261 (8th Cir.1982); Missouri Highway and Transportation Commission v. Morganstein, et al, 703 S.W.2d 894, 898 (Mo.1986); Waidmann v. Mercantile Trust Co. National Association, 711 S.W.2d 907, 911 (Mo.App. 1986). "An irrevocable letter of credit creates an independent obligation of the issuing bank to pay the beneficiary upon timely presentment of the documents specified in the credit." Global Network Technologies v. Regional Airport Authority of Louisville and Jefferson County, 122 F.3d 661, 664 n. 2 (8th Cir.1997). Article 5 of the Uniform Commercial Code (U.C.C.) generally governs letters of credit; however, Missouri has codified Article 5 in *875 § 400.5-101 et.seq. R.S.Mo. Since this is a diversity case, the law of Missouri will apply.
Under Missouri law, the provisions of the UCC do not apply to a letter of credit which states that it is governed by the UCP. Fidelity & Deposit Company of Maryland v. Federal Deposit Insurance Corp., 54 F.3d 507, 510 n. 3 (8th Cir.1995); Landmark Bank v. National Credit Union Administration, 748 F.Supp. 709, 714-15 (E.D.Mo.1990); Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A., 803 S.W.2d 23, 34 (Mo. 1991); see also, § 400.5-103 R.S.Mo. The UCP (formally known as the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce, Publication No. 500) is an internationally accepted compilation of international customs and practices regarding letters of credit.[8] The UCP sets forth basic principles and specific rights and obligations of parties involved in letter of credit transactions and is commonly adopted by international and domestic letters of credit as the "law of the transaction" by agreement of the parties. See, 832 PLI/Comm. 13: Regal, Dorothea W., Basic Principles of Letters of Credit; see also, Uniform Commercial Code Comment to §§ 400.5-102 and 103. The UCP is revised every ten (10) years; the latest revision UCP 500 was last revised in 1993.[9] A LOC governed by the UCP will be governed by the UCC (or in this case § 400.5-101 et.seq. R.S.Mo.) only in those instances wherein the UCP does not contain any provision relevant to the issue in controversy.
A letter of credit is actually the third part of a complex triparte contractual transaction consisting of three (3) separate and distinct contracts. They are:
1) The contract between the issuer (generally a bank) and its customer (the applicant) whereby the issuer agrees to issue the letter of credit (to the thirdparty beneficiary);
2) the underlying contract between the applicant and the beneficiary giving rise to the issuance of the letter of credit; and
3) the letter of credit itself, which is a contract between the issuing bank and the beneficiary and provides that the issuing bank agrees to pay the draft(s) drawn against the letter of credit upon presentation of said draft(s) and accompanying requisite documents.
In re Papio Keno Club, 247 B.R. 453, 459 (8th Cir.BAP2000), affd 262 F.3d 725 (8th Cir.2001); Bank of Newport, at 1261; Morganstein, at 898; Waidmann, at 911-12. The issuer of a LOC has a direct primary obligation to honor a demand for payment under the LOC. This obligation arises merely upon the proper and timely presentation of a demand for payment, accompanied by any documents, statements, or certifications specified in the LOC as required by the terms and conditions of the LOC. Morganstein, at 898.
The most fundamental principle of modern letter of credit law is that the three (3) contractual relationships giving rise to the letter of credit are completely independent of each other, and the rights and obligations of the parties to one are not affected by the breach or nonperformance of any of the others. See, 832 PLI/Comm 13; B.E.I. International, Inc. v. The Thai Military Bank, 978 F.2d 440, *876 442 (8th Cir.1992); Bank of Newport, at 1261; Morganstein, at 898. This fundamental principle of letters of credit law is commonly referred to as the "independence principle". Thus, the LOC is separate and distinct from the underlying contractual transactions among the issuing bank, the bank customer, the beneficiary, and others. B.E.I. International, supra.; Bank of Newport, supra.; Anchor Centre, at 34-35. The LOC creates an independent obligation of the issuing bank to pay the beneficiary upon timely presentation of the draft and documents as specified in the LOC. Papio Keno Club, 247 B.R., at 459; Global Network, at 664 n. 2; Bank of Newport, supra. The issuing bank's obligation to honor the presented draft exists regardless of any default of the underlying contractual transaction(s). Papio Keno Club, 247 B.R. at 459; Anchor Centre, at 34-35; Morganstein, at 898; Waidmann, at 912.
The "independence principle" is based upon two (2) public policy considerations. "First, the issuing bank can assume no liability for the performance of the underlying contract because it has no control over making the underlying contract or over selection of the beneficiary. Second, the letter of credit would lose its commercial vitality if, before honoring drafts, the issuing bank were obliged to look beyond the terms of the letter of credit to the underlying contractual controversy between its customer and the beneficiary." Bank of Newport, at 1261-62 (citations omitted). Thus, in determining whether to honor a draft drawn upon a LOC, the issuing bank should look solely to the letter of credit and the documents required therein regardless of whether the underlying contract has been performed. Waidmann, at 912 citing Morganstein, at 899. The UCP 500, Article 3 articulates the "independence principle" as follows: "(a) Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfill any other obligation under the Credit, is not subject to claims or deferences by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary."
The "independence principle" works in tandem with a "strict compliance" standard applicable to the draft and accompanying documents' presentation for payment. The issuing bank's obligation to honor the presentation is triggered by the timely and proper presentation of the draft and conforming documents. If the LOC is governed by the UCP, then the parties are bound by the strict compliance standard of the UCP. Morganstein, at 898; Waidmann, at 912. Article 13 of the UCP 500 provides in part: "Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit." Thus, if the beneficiary tenders the appropriate documentation, in a timely manner, the issuing bank must honor the presentation. Only the propriety of the tender of the draft and documents presented can be considered by the issuing bank. Morganstein, supra.; see also, Global Network, at 665 citing Anchor Centre, at 34-35 ("Because of the issuing bank's independent commitment to honor its letter of credit, courts require that documents submitted with a draw comply precisely with the literal terms of the credit. That reduces the issuer's task to comparing the documents against its credit.").
*877 There is only one limited exception to the "independent principle": fraud in the transaction. There is no provision in the UCP 500 regarding fraud or means for stopping payment under a LOC in any circumstance. However, Section 5-109 of the UCC (§ 400.5-109 R.S.Mo.) permits an issuer to dishonor where a "presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or materially fraudulent or honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant".[10] This recodification clearly denotes that fraud must be found either in the documents or must have been committed by the beneficiary on the issuer or applicant. § 400.5-109 R.S.Mo., Uniform Commercial Code Comment. Furthermore, "[m]aterial fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor." Uniform Commercial Code Comment, Id.
Finally, an issuer is precluded from justifying a dishonor upon any ground that was not identified by the issuer in a timely notice of dishonor. Article 14 of the UCP 500 provides in pertinent part:
"(d)(i) If the Issuing Bank and/or Confirming Bank, if any, or a Nominated Bank acting on their behalf, decides to refuse the documents, it must give notice to that effect by telecommunication or, if that is not possible, by other expeditious means, without delay but no later that the close of the seventh banking day following the day of receipt of the documents. Such notice shall be given to the bank from which it received the documents, or to the Beneficiary, if it received the documents directly from him.
(ii) Such notice must state all discrepancies in respect of which the bank refuses the documents and must also state whether it is holding the documents at the disposal of, or is returning them to, the presenter.
(e) If the Issuing Bank and/or Confirming Bank, if any, fails to act in accordance with the provisions of this Article and/or fails to hold the documents at the disposal of, or return them to the presenter, the Issuing Bank and/or Confirming Bank, if any, shall be precluded from claiming that the documents are not in compliance with the terms and conditions of the Credit."
To balance the rule of strict compliance, Article 14 provides for a rule of strict preclusion. "It bars the issuer from relying on any nonconformity in the documents if it failed to give the prescribed timely notice of dishonor or if it failed to identify in its notice of dishonor the discrepancy upon which it subsequently seeks to rely." 832 PLI/Comm 13, 71-72. Thus, an issuer must not only give its notice of dishonor within the proscribed time, but must also clearly and specifically identify the defect in the draft and/or accompanying required documents or the notice has no effect. See, Toyota Tsusho Corp. v. Comerica Bank, 929 F.Supp. 1065,1074-76 (E.D.Mich.1996).
After careful consideration of the matter, the Court finds that defendant Concord Bank wrongfully refused to honor the November 17, 2000 sight draft drawn on the subject letter of credit as presented by plaintiff Amwest Surety.
It is undisputed that Amwest presented its sight draft and accompanying certification on November 17, 2000. It is also undisputed that Article 14 of the UCP *878 clearly provides that an issuer must give notice of dishonor of a LOC "no later than the close of the seventh banking day following the day of the receipt of the documents." There is no dispute that this deadline was November 28, 2000. Defendant offers no excuse for its lateness for tendering the notice of dishonor except to contend that its allegation of fraud obliterates the notice deadline of Article 14.[11]
Article 14 of the UCP deals with patent defects. It is true that by its wording, Article 14 proscribes a specific deadline by which defects evidenced on the face of the documents should be readily discovered and notice of same given. Article 14 does not appear to deal with latent defects; i.e. cases in which the issuer discovers fraud, not readily apparent on the face of the documents, sometime after the time for notice of defects has passed. Caselaw addressing Article 14's notice of defect deadlines is scarce; however, one case (cited by both parties) has held that an issuing bank can disclaim based on latent fraud after the Article 14(d)(i) period has expired. Hamilton Bank v. Kookmin Bank, 245 F.3d.82, 91 (2nd Cir.2001).
It is clear that the Bank's claim of fraud is not based on latent fraud. The Bank's notice of dishonor clearly stated that it was rejecting the sight draft because the statement in the certification regarding Amwest's non-release from liability by the obligee was "fraudulent". Furthermore, this wasn't a case where acts of fraud were discovered sometime after the notice of dishonor deadline had passed. Concord Bank concedes that its dishonor was based upon information it had in its possession prior to receipt of the sight draft and certification. Defendant's excuse of fraud as justification for its late notice of dishonor does not suffice as a matter of law.
Furthermore, not only was the notice of dishonor late in violation of Article 14, but the notice itself was defective in that it failed to state all the discrepancies upon which the LOC was being refused. Concord Bank contends that not only did it reject the sight draft due to the (mis)statement concerning Amwest's release from liability but that it also rejected the draft because Amwest was financially weak at the time of the draw and would not be able to refund any excess amounts under the LOC. The December 5, 2000 notice of dishonor stated only one reason for the refusal to honor: Amwest's alleged fraudulent statement that it had not been released from liability by the obligee. Nowhere in the notice of dishonor is there any reference to Amwest's financial condition as being grounds for refusal to honor the draft. Once again, the notice of dishonor was insufficient as a matter of law.
Defendant Concord Bank is further precluded from claiming that the sight draft and/or its accompanying documents are not in compliance with the terms and conditions of the LOC by its dereliction in returning the documents to Amwest. Article 14(d)(ii) of the UCP 500 requires that the notice of dishonor not only state all discrepancies upon which the notice is based but that the notice "must also state whether it is holding the documents at the disposal of, or is returning them to, the presenter." Article 14(e) of the UCP 500 clearly states that if the issuing bank "fails to act in accordance with the provisions of this Article and/or fails to hold the documents at the disposal of or return to the presenter, the issuing *879 bank shall be precluded from claiming that the documents are not in compliance with the terms and conditions of the letter of credit. In the present case, the notice of dishonor clearly fails to state that Concord Bank is holding the subject documents at the disposal of or is returning them to Amwest. Concord Bank concedes that it still holds the subject documents having never offered to return them to Amwest prior to this litigation. Its justification for this action is simply that Amwest never asked for the sight draft or the accompanying documents back. However, neither the UCC nor the UCP places any affirmative duty on the presenter to ask for the return of the documents. The only affirmative duty existing is upon the issuing bank to state its intentions with regard to the documents in its notice of dishonor. See, § 400.5-108 R.S.Mo. Failure of Concord Bank to fulfill this notice requirement in Article 14 precludes it from asserting any grounds for rejecting the LOC documents. See, Toyota Tsusho Corp. v. Comerica Bank, 929 F.Supp. 1065 (E.D.Mich. 1996).
Assuming arguendo that there was no prevailing issue of timeliness of the notice or insufficiency of the notice under the UCP, no reasonable juror could conclude that Amwest had not strictly complied with the presentation requirements under the subject LOC, and that Concord Bank's dishonor of the presentation of the sight draft and accompanying documents was in violation of the UCC, the UCP, and the well-established principles of letter of credit law.
As its primary reason for dishonoring the LOC involved here, Concord Bank contends that when Amwest Bank certified that it had not been released by the obligee from its liability under the bonds, such statement was false. It then exerts considerable effort detailing the underlying contractual relationships of non-party entities, especially, the actions by the City of St. Louis with respect to certain payments it made in connection with the Argyle Parking Garage project. It concludes, based upon its investigation and outside research, that the City's misdirection of funds, in violation of certain contracts (to which Concord was not a party), was a material breach releasing Amwest completely from liability under the performance bond. It is clear that this argument depends on support upon legal interpretations of transactions other than those facially represented in the documents presented with the sight draft. Such consideration by this Court clearly violates the well-established letter of credit "independence principle".
Firstly, the Comments to the UCC in connection to § 400.5-109 R.S.Mo. embrace a narrow scope defining the fraud required to support a dishonor. Such fraud not only has to be found either in the documents themselves or committed by the beneficiary, but also the fraud must be "material"; i.e. "the fraudulent act must be significant to the participants in the underlying transaction.". The Comment further defines such a material fraud as "occurfing] only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor." Finally, the Comment "indorses articulations" found in prior Section 5-109 cases which relied upon the phrase "fraud in the transaction".[12] Concord's assertion of fraud fails because the subject statement does not carry with it any connotation that Amwest itself was *880 guilty of participating in any fraudulent act in the underlying contractual transactions. Concord concedes that any "material breach" of the underlying contract(s) was carried out by the City. Amwest had nothing to do with the misdirection of funds by the City. It was not a party to the contracts among the City, CMR, and the disbursing companies. More importantly, Concord Bank was not a party to any of these contracts. Not only was Amwest not involved with the material breach repeatedly argued by Concord, the alleged material breach by the City did not involve Concord Bank. The matter of the diverted contract funds paid by the City to CMR is entirely collateral to and beyond consideration of the "face" of the documents presented on November 17, 2000. Any alleged fraud in a collateral transaction is not the fraud contemplated by the UCC as a justifiable cause for dishonoring a LOC.
Next, even if this Court were to find cause to violate the "independence principle" and review the underlying transactions and contractual relationships of non-parties, it is clear that there was a basis in fact to support Amwest's colorable right to expect honor. Concord argues extensively that the City's misdirection of funds completely released Amwest from its liability under the performance bond. In support of this contention, in its notice of dishonor, it relied on the old case of Prairie State National Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896). This case is totally inapplicable as it did not involve a letter of credit or alleged fraud by the beneficiary in its presentation of a sight draft under a LOC. Current surety caselaw indicates, that at best, the actions of the City would only reduce Amwest's liability pro tanto; i.e., only by the amount of the City's misdirected funds. See, National Surety Corp. v. United States, 118 F.3d 1542 (Fed.Cir. 1997).[13]
Furthermore, there is no evidence that the misdirected funds would completely release Amwest from liability under the payment bond. There are no documents executed by the City or any subcontractor completely releasing Amwest from liability under either the performance or payment bonds. No reasonable juror could conclude that Amwest had without a doubt been completely released from liability under either of the bonds, especially in light of the correspondence sent by Amwest to Concord (between November 17, 2000 and December 5, 2000) informing Concord that claims had been made against the payment bond by subcontractors and suppliers, and that the City had made a written demand on Amwest for it to honor all of its obligations under the performance and payment bonds.
Concord Bank decided to dishonor the sight draft relying upon its own independent review of the underlying contractual relationships and actions by non-parties, and its own "legal" research regarding Amwest's rights under the performance and payment bonds. Amwest, not Concord Bank, bears the burden of determining its rights under the subject bonds because it is in the business of issuing such *881 bonds and is in a better position to know and protect its rights. See, Fidelity & Deposit Company of Maryland, at 514 (issuing bank determining whether the beneficiary surety under a LOC had obligations to its customer at time of presentation violated the rule of independence because surety alone is responsible for determining its rights under a bond). This research and the reliance there upon violated the "independence principle" and the relevant provisions of the UCC and the UCP 500.
It is this Court's finding that fraud is neither an affirmative defense nor a viable reason for dishonoring the sight draft and accompanying document(s) under the subject LOC as presented by plaintiff on November 17, 2000. Furthermore, as no material issue of fact exists that the notice of dishonor was given after the Article 14(d)(i) of the UCP 500 time period for notification of dishonor had passed, Concord Bank could not refuse to honor the LOC and the sight draft presented drawing upon it based upon fraud in the transaction, fraud in the documents presented, or the financial condition of Amwest at the time of the presentation. Finally, as no material issue of fact exists that the notice of dishonor failed to apprise Amwest of whether Concord Bank was holding the subject documents at the disposal of, or was returning them to Amwest Bank, and in fact still remains in possession of said documents[14], in violation of Article 14(d)(ii) of the UCP 500, Concord Bank could not refuse to honor the LOC and the sight draft presented drawing upon it based upon fraud in the transaction, fraud in the documents presented, or the financial condition of Amwest at the time of the presentation. Since there is no material issue of fact that the sight draft and accompanying documents presented under the subject LOC by Amwest on November 17, 2000 strictly complied with the terms and conditions of the subject LOC, Concord Bank dishonored the sight draft wrongfully as a matter of law.
In light of the above findings, the Court sees no reason to address the remaining grounds proffered by the plaintiff in support of its motion for summary judgment as to Count I.
Count II of the plaintiffs complaint seeks damages on the basis of state-law conversion. Amwest contends that Concord Bank, by retaining the sight draft and accompanying documents presented under the subject LOC on November 17, 2000, it has violated certain provisions of the UCC and the UCP 500 and thus, has converted said documents to its own use under Missouri law. Concord Bank essentially contends that the documents have not been converted under Missouri law, that such documents are worthless, and that Amwest can have them back anytime upon request.
Both the UCC and the UCP require the issuing bank to return the LOC's draft and accompanying documents to the beneficiary upon rejection of same, or to hold them for disposal as directed by the beneficiary. Regardless of which action the issuing bank takes, it has the affirmative duty to inform the beneficiary of its intent in the notice of dishonor. Section 400.5-108(h) R.S.Mo.; Article 14(d)(ii) of the UCP 500. It is undisputed that Concord Bank not only failed to give notice as to whether it intended to return the documents or hold them for disposal as directed by Amwest; but, has in fact retained said documents without authorization from Amwest.
Under Missouri law, there are three (3) ways a plaintiff can prove conversion: 1) by tortious taking; 2) by any use or appropriation to use of the person in possession indicating a claim of right in *882 opposition to the rights of the owner; and 3) by refusal to give up possession to the owner on demand. Lucas v. Lucas, 946 F.2d 1318, 1323 (8th Cir.1991); Lacks v. R. Rowland & Co., 718 S.W.2d 513, 521 (Mo. App.1986). The subject of the conversion need not be strictly a "tangible chattel" but can be the ownership interests in a negotiable interest, such as stock certificates, or as in this case, a letter of credit. See, Lucas v. Lucas, at 1323; Lacks, at 517; see also, Dodge Motor Trucks, Inc. v. First National Bank of Omaha, 519 F.2d 578, 583 (8th Cir.1975)("A letter of credit is in the nature of a negotiable instrument, and is a letter whereby a person requests another to advance money or give credit to a third person and promises to repay the person making the advancement."). In order to prove conversion by tortious taking[15], Amwest had to submit evidence showing that Concord Bank wrongfully took possession of the LOC sight draft and accompanying documents for itself. See, Lucas v. Lucas, at 1324-25.
In the present case, it is undisputed that Concord Bank took possession of the sight draft and accompanying documents and has retained possession of said documents for itself. It is also undisputed that the notice of dishonor did not notify Amwest of either Concord Bank's intention to return the documents or to hold them for disposal at Amwest's directions. Concord Bank's failure to comply with the provisions of Article 14 of the UCP 500 and Section 400.5-108(h) by retaining possession of the sight draft and accompanying documents without Amwest's authorization and/or in disregard of its demand for return (via its complaint filed in this litigation) conclusively establishes plaintiffs claim for conversion under Missouri law.
Concord Bank's contention that conversion does not lie under Missouri law because the documents are worthless is without merit. It is clear under Missouri law that the physical manifestation of the security ownership (such as stock certificates) is not the subject of the conversion, but rather is only the "symbol" of the underlying ownership interest in the security. See, Lucas v. Lucas, at 1323; Lacks, at 517 ("Historically wrongful appropriation of stock certificates constitutes conversion of the stock."). Here, the sight draft represents Amwest's exclusive right to collect monies based upon the terms and conditions of the LOC. In this case, that exclusive right is hardly "worthless", rather it is worth at least $1,200,000.00 plus interest. Furthermore, defendant's contention that plaintiffs claim of conversion fails because Amwest has not asked for the documents is equally without merit. As previously noted, the UCC and the UCP 500 both place an affirmative duty upon Concord Bank, as the issuing bank dishonoring the sight draft, to notify the beneficiary (Amwest) of either its intention to return the documents or to hold them for disposal at the beneficiary's directions. Concord Bank did not comply with the requirements of the UCC and the UCP 500, and has retained the subject documents despite the filing of this lawsuit. Finally, it is no defense to a claim of conversion that the act was in good faith or in honest belief that the possession was lawful. See, Ensminger v. Burton, 805 *883 S.W.2d 207, 211 (Mo.App.1991). There is no material issue of fact regarding Concord Bank's non-compliance with the notice of dishonor requirements of the UCC and the UCP 500, and its retention of the subject documents. Amwest is entitled to summary judgment on its Count II claim for conversion as a matter of law.
Exemplary and punitive damages are not addressed by the UCP 500. The UCC expressly forbids the award of consequential damages in cases of wrongful dishonor. § 400.5-111(a) R.S.Mo. The UCC does not address the issue of punitive damages but the Uniform Commercial Code Comment to Section 5-111(4) states that "[a] fortiori punitive and exemplary damages are excluded, however, this section does not bar recovery of consequential or even punitive damages for breach of statutory or common law duties arising outside of this article." Although the plaintiff seeks $1,200,000.00 plus interest as an award of punitive damages under Count III, it fails to provide this Court with any statutory or caselaw authority in support of its demand. It is this Court's considered opinion that punitive damages are disfavored by commercial law, especially in the context of letter of credit law, and the instant case does not provide evidence of the type supporting an award of punitive damages for wrongful dishonor of a letter of credit. As for plaintiffs conversion claim, plaintiffs lack of legal authority supporting its claim for punitive damages, coupled with the fact that the primary basis for the conversion claim is defendant's failure to comply with the notice requirements of the UCP 500, leads this Court to deny Count III's claim for punitives as to the conversion claim also.
Although not addressed by the UCP 500, Missouri's UCC clearly provides for prejudgment interest in cases of wrongful dishonor. An issuing bank which is found to have wrongfully dishonored a sight draft presented under a letter of credit "... shall pay interest on the amount owed thereunder from the date of wrongful dishonor or other appropriate date." § 400.5-111(d) R.S.Mo. Since the UCC fails to define the applicable statutory rate, plaintiff offers two (2) rates for consideration by the Court: 10% per annum pursuant to § 433.050 R.S.Mo. or 9% per annum pursuant to § 408.020 R.S.Mo.
Under Missouri's UCC, in cases of wrongful dishonor by an issuing bank, a beneficiary may recover the face value of the LOC. A beneficiary whose LOC has been wrongfully dishonored has no duty to "prove" its damages or to mitigate its damages; its damages are for the breach of its credit contractual relationship with the issuing bank and the appropriate measure of such damages is the face value of the LOC. See, Hamilton Bank v. Kookmin Bank, at 93; Ross Bicycles v. Citibank, N.A., 161 Misc.2d 351, 613 N.Y.S.2d 538 (N.Y.Sup.Ct.1994); see also, Kelley v. First Westroads Bank, 840 F.2d 554 (8th Cir.1988). After review of the plaintiffs arguments and the relevant statutory provisions cited by plaintiff[16], the Court has determined that the applicable statutory interest rate is 9% per annum pursuant to § 408.020 R.S.Mo.
Section 408.020 R.S.Mo. states:

*884 "Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts and on accounts after they become due and payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made."
As stated previously, a letter of credit implicates three (3) contractual relationships. The LOC itself is in the nature of a contract between the issuer and the beneficiary and is independent of underlying contracts. To apply § 433.050 R.S.Mo. and determine that Concord Bank stands as a "co-principal debtor" (as argued by the plaintiff) would violate the "independence principle". The LOC stands as its own contract and since it does not stipulate any specific interest rate, § 408.020 R.S.Mo. applies.
Plaintiff contends that prejudgment interest should ran from December 2, 2000 to March 20, 2002. It chose December 2, 2000 as the date upon which interest commenced because under the LOC the last day for Concord Bank to pay on the draft was December 2, 2000 (fifteen days from the date of receipt of the draft). Since there is no dispute as to the use of these dates for the computation of prejudgment interest, the Court will accept same.
Under Missouri law, the proper measure of damages for conversion is the reasonable market value of property at the time of the conversion. Lucas v. Lucas, at 1328-29; Citizens Bank of Appleton City v. Schapeler, 869 S.W.2d 120, 130 (Mo.App. 1993); Ensminger v. Burton, et. al., 805 S.W.2d 207, 218 (Mo.App.1991); Southern Missouri Bank v. Fogle, 738 S.W.2d 153, 158 (Mo.App.1987); Lacks v. R.Rowland & Co., at 520. Interest, pursuant to §§ 408.020 R.S.Mo. and 537.520 R.S.Mo., is allowed in conversion cases on the value of the converted property from the date of its conversion. Citizens Bank of Appleton City, at 130; Ensminger, at 218 (relying on Fogle); Fogle, at 158. In the instant case, plaintiff seeks damages for the face value of the rejected LOC sight draft, and interest at the 9% per annum rate proscribed by § 408.020 R.S.Mo. Plaintiff further seeks said interest from December 2, 2000 to March 20, 2002. The Court concurs.
Thus, on Counts I and II, the interest figured at 9% on the One Million Two Hundred Thousand Dollars ($1,200,000.00) due and owing on the Letter of Credit as of December 2, 2000 through March 20, 2002 is Two Hundred Ninety-Five Dollars and Eighty-Nine Cents ($295.89) per day for a total of One Hundred Thirty-Nine Thousand Nine Hundred Fifty-Five Dollars and Ninety-Seven Cents ($139,955.97).
In an action for wrongful dishonor of a letter of credit, "[reasonable attorney's fees and other expenses of litigation must be awarded to the prevailing party ...". § 400.5-111(e). An award of fees is mandatory. In the instant case, plaintiff seeks a large amount of fees based upon a generalized invoice documenting fees in this litigation. Furthermore, it seeks interest upon said fees. See, Plaintiffs Exhibit R and R1. The Court has reviewed the plaintiffs exhibit in support of its claim for attorneys' fees and finds same inadequate. Attorneys' fees will be awarded; however, such award will be made upon the proper presentation of documents in support of such fees. Plaintiff shall submit affidavits of education background, litigation experience in similar cases as this one, and standard hourly rate for each attorney and paralegal who performed work in this matter. Furthermore, legal fees shall be limited *885 to those hours spent on plaintiffs claim for wrongful dishonor and conversion, not on plaintiffs claim for punitives. Finally, each attorney and paralegal's hours expended in this case shall be specifically identified. Essentially, documentation shall be filed which identifies the attorney or paralegal who worked on this case and the hours that person expended. Finally, it is not this Court's standard practice to award interest on attorneys' fees; however, the Court will entertain this request upon a valid showing of statutory law and/or caselaw supporting the award of interest on attorneys' fees.
In light of the above findings of this Court, summary judgment will be granted to plaintiff on Counts I and II of its complaint; summary judgment will not be granted on Count III of plaintiffs complaint. Furthermore, attorneys' fees will be awarded at a later date.
NOTES
[1] Except for Amwest, none of the parties to the Construction Contract, Disbursement Agreement, and Letter of Direction are parties to this lawsuit. Defendant Concord Bank is not a party to any of the afore-referenced contractual documents.
[2] It is unclear as to what ultimately happened with regard to these two payments.
[3] Plaintiff contends that it would not be completely released of liability under the performance bond due to the City's actions, but rather, it would be released pro tanto; i.e. its obligation reduced only the amount of the City's misdirected payment.
[4] No citation nor reference to a page number was given by defendant when it cited to this case in its notice of dishonor. For the record, the complete citation is as follows: Prairie State National Bank of Chicago v. United States, 164 U.S. 227, 238, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896).
[5] Actually, presently before the Court in the defendant's second amended answer.
[6] In a companion order and memorandum, the Court has recently granted the plaintiff's motion to dismiss defendant's counterclaim.
[7] Due to financial difficulties, Amwest's bond rating was reduced from A- to ultimately B-. As of June 1, 2001 Amwest became the subject of an "Order of Liquidation, Declaration of Insolvency, and Injunction" entered by the District Court of Lancaster County, Nebraska. See, Exhibit A to Defendant's Suggestion of Receivership, # 23, filed July 11, 2001. However, the Special Deputy Liquidator relative to the Liquidation of Amwest Surety Ins. Co. (Michael J. Fitzgibbons) has authorized plaintiff's counsel to proceed with this litigation on behalf of Amwest Surety. See, Exhibit A to Plaintiff's Response to Court Order of August 6, 2001 (inquiring as to the status of the plaintiff in light of the liquidation), # 25, filed August 27, 2001.
[8] A copy of the UCP 500 is provided as Plaintiff's Exhibit M.
[9] Much of the applicable caselaw refers to the prior 1983 UCP revision. However, many of the legal principles articulated in the UCP 400 (1983) remained unchanged in the UCP 500 (1993).
[10] Except in instances where the presentation is made by a nominated person, a confirmer, a holder in due course, or assignee in good faith. § 400.5-109(a)(1).
[11] The subject LOC states only that the honor of the sight draft must be made no later than fifteen (15) days from date of receipt by the Concord Bank. Since the LOC does not reference any specific deadline in connection to the "dishonor" of a sight draft, the seven (7) banking day rule of the UCP 500 applies.
[12] Fraud as an affirmative defense to a wrongful dishonor was previously set forth in the 1962 Code in Section 5-114. The current UCC is commonly referred to as the revised 1995 Code and, as previously set out, the fraud provision is now contained in Section 5-109.
[13] Curiously, although Concord Bank argues generally that the misdirected funds constituted a material breach by the City of its contractual obligations to other non-parties, which would relieve Amwest completely of its liability under the performance bond, it states unequivocally that "...Plaintiff and Mr. Haren knew that any obligations to the City would be reduced by at least $481,122.90 that the City had improperly paid directly to the contractor" (citing National Surety, supra.). Defendant Concord Bank's Memorandum in Opposition to Summary Judgment, pg. 8. Such a statement would appear to embrace Amwest's position regarding a pro tanto reduction of liability, as opposed to a complete release of liability.
[14] At least as of the time of the filing of this summary judgment package.
[15] Although the plaintiff never identifies which of the three (3) ways one can prove conversion it is relying upon, the facts of this case indicate that the claim is one for conversion by tortious taking. A weaker case could be made for conversion by refusal to give up possession in the face of a demand given that as of the filing of the plaintiff's complaint on December 15, 2000 seeking damages and the return of the subject documents, Concord Bank has retained possession of same. Either way, Amwest has proven conversion as set forth above.
[16] Defendant's only argument addressing damages was limited to its position that plaintiff had not suffered any damages because it had been completely released from liability under the performance bond and/or that plaintiff's damages were "self-inflicted" because plaintiff chose to finance the completion of the garage project. Both of these arguments have been shown to lack merit. Defendant did not address the issue of the statutory interest rate applicable to damages in a wrongful dishonor case.